MICHIGAN MILLERS INSURANCE COMPANY, Appellee,

v.

ANSPACH et al., Appellants.

[Cite as *Michigan Millers Ins. Co. v. Anspach* (1996), 109 Ohio App.3d 618.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 15211.

Decided March 1, 1996.

*Edwin J. Hollern,* for appellee.

*David P. Williamson,* for appellant Charles R. Anspach.

*Ronald Schultz,* for appellant Judith Simpson.

FAIN, Judge.

Defendants-appellants, Charles R. Anspach and Judith S. Simpson, appeal separately from the trial court's judgment declaring that Michigan Millers Mutual Insurance Company is not obliged to defend or to indemnify Anspach for the intentional acts of Scott and Christopher, his sons, who were both minors at the time. Anspach contends that the trial court erred (1) in determining that the intentional acts exclusion precludes coverage in this case, and (2) in finding that Scott and Christopher were bound by the criminal acts of co-conspirators by

imputing knowledge to them as co-conspirators. Simpson, on behalf of herself and as administrator of the estate of her daughter, Amanda M. Simpson, deceased, contends (1) that the trial court erred as a matter of law (a) in concluding that *Physicians Ins. Co. v. Swanson* (1991), 58 Ohio St.3d 189, 569 N.E.2d 906, is not applicable to this case, and (b) in construing R.C. 2307.70 to require that acts of minors be non-intentional to impose liability on parents for damages; and (2) that the record before the trial court does not support its finding that the Anspach brothers knew that Judith and Amanda Simpson were in the house when it was set on fire.

We conclude that the trial court erred as a matter of law in carving out a new exception under *Swanson*. Thus, we *reverse* the judgment of the trial court and enter judgment, as a matter of law, in favor of Anspach and Simpson.

## I

Around midnight on April 28, 1991, a group of juveniles, David Clark, Robert Brigeman, Jestin Thomason, Christopher and Scott Anspach, Cynthia Huffman, and Elizabeth Burns were hanging out at Brigeman's house. Clark and Brigeman planned to burglarize Judith Simpson's house at 831 Clover Street and to conceal the burglary by setting fire to the house. During his deposition taken for purposes of this declaratory judgment action, Brigeman testified that Simpson had told him that she planned to go fishing that night around 10:00 p.m. and had asked him if he would like to join her. The record contains evidence that the juveniles believed the house to be unoccupied that night. The Anspachs, Huffman, Thomason, and Burns agreed to act as lookouts and knew of the plan to set the house on fire. Clark took a gasoline can from Brigeman's house and carried it as the group walked to Clover Street. On the way, the group met John Spicer. Clark told Spicer of the plan, and Spicer joined the group.

Clark and Spicer broke into the house through the back door and removed a microwave from the kitchen while the Anspachs, Huffman, Thomason, and Burns stayed outside the house as lookouts. Clark and Spicer re-entered the house and Brigeman followed them. While looking for more items to steal, Spicer noticed that Judith Simpson was asleep on a couch in the living room. Failing to find anything else to steal, Clark poured gasoline around the kitchen. Thomason, standing in the back doorway of the house, saw Clark emptying the gasoline can. At Clark's criminal trial, Spicer testified that he asked Clark about the people in the house. According to Spicer's testimony at the trial, Clark responded: "Fuck them. Let them burn." Thomason's testimony at Clark's trial and his deposition testimony in this case corroborate Spicer's testimony. Spicer and Thomason testified that Clark lit the fire. Clark, Spicer, Brigeman, and Thomason ran from the house. The others, still outside as lookouts, ran with them. Judith and

Amanda were asleep in the house. Judith was injured in the fire and Amanda died from her injuries shortly after the fire.

Clark and Spicer were bound over as adults from juvenile court. Clark was tried before a jury and convicted of aggravated murder, one count of attempted aggravated murder, two counts of aggravated burglary, and one count of aggravated arson.[1] Spicer pled guilty to two counts of aggravated burglary and one count of involuntary manslaughter. Chris Anspach was tried in juvenile court and found delinquent by reason of having committed the offense of involuntary manslaughter. The others, including Scot Anspach, admitted delinquency by reason of having committed involuntary manslaughter.

. Simpson filed a complaint for personal injuries and wrongful death against all of the juveniles and their parents. Michigan Millers Insurance Company had insured Charles Anspach under a homeowner's policy. Michigan Millers, in response to Simpson's suit, filed a declaratory judgment action requesting the trial court to determine whether it had a duty to defend and to indemnify Anspach under its policy. The parties agreed that the trial court would determine the declaratory judgment action based on stipulated facts and joint exhibits, including excerpts from Clark's criminal trial and depositions of the other juveniles taken for purposes of the declaratory judgment action.

In its decision, entry and order, the trial court found that Scott and Chris Anspach "were part of a course of criminal conduct which was to culminate in the theft of the property. According to testimony which this Court finds credible, known to *all* was the presence of a can of gasoline, which was to be used to conceal the crime of burglary conducted by Clark, Spicer and Brigeman. Specifically, the Court finds it was known to Spicer that there was at least one human being present at the Clover Street home. Additionally, it was known to the Anspachs that there was a plan and design to conceal the crime by using the gasoline to set a fire (an act of arson)." (Emphasis *sic.*)

The trial court found that all co-conspirators were bound by the actions of the principals, imputed knowledge of the presence of persons in the house, and inferred intent to harm persons by all co-conspirators. Specifically, the trial court found that the holding in *Physicians Ins. Co. v. Swanson* (1991), 58 Ohio St.3d 189, 569 N.E.2d 906, is not applicable to criminal conduct, such as arson. Consequently, the trial court held that the policy exclusion based on intentional conduct precluded coverage. Additionally, the trial court concluded that parental liability for intentional acts of unmarried minors under R.C. 2307.70 is not triggered.

---

1. See *State v. Clark* (May 4, 1994), Montgomery App. No. 13435, unreported, 1994 WL 171223, discretionary appeal denied (1994), 71 Ohio St.3d 1411, 641 N.E.2d 1110.

Simpson filed a motion for supplemental findings of fact, requesting that the trial court provide two additional findings of fact to supplement its decision. Specifically, Simpson asked the trial court to determine whether or not Scott or Chris Anspach "knew persons were present at the Simpson residence at the time of the alleged criminal act." In an entry dated April 13, 1995, the trial court found:

"Among the factual findings in the Decision, Entry & Order filed March 17, 1995, the Court declared the existence of a criminal conspiracy and that the co-conspirators were bound by the acts of the other co-conspirator. Consequently, knowledge of one co-conspirator was imputed to the other co-conspirators. Both Christopher and Scott Anspach knew a robbery [*sic*, burglary] was to take place at the Simpson home and both knew that a fire was to be set to conceal the robbery. Additionally, it was known to all that living people were in and out of the house during the day and evening in question."

After having read the entire record before this court, we are unable to find support for the trial court's finding in the last sentence of the entry, quoted above. In his deposition, Spicer testified at some length about Simpson's preparations to go fishing earlier that day. The others testified that they knew about the fishing trip or that, while they did not know Simpson, they had been told that the house would be empty that night. The record indicates that all of the juveniles expected the Simpson house to be empty that night. It was not until after Clark and Spicer reentered the house that they discovered it was occupied. The record also indicates that none of the lookouts knew that people were in the house until after the fire had been set.

From the declaratory judgment in favor of Michigan Millers, Anspach and Simpson appeal.

## II

Anspach's first and second assignments of error are as follows:

"The trial court erred by entering judgment in favor of Michigan Millers Mutual Insurance Co., plaintiff-appellee, and sustaining the policy exclusion 'based upon intentional conduct.'

"The trial court erred in finding that, with respect to the application of an insurance policy exclusion, a co-conspirator is bound by the acts of other co-conspirators, and that knowledge of a co-conspirator is imputed to the other co-conspirators."

Simpson's first and second assignments of error are as follows:

"The trial court erred as a matter of law in finding the 'intentional acts' and 'criminal acts' exclusions contained in Michigan Millers Mutual Insurance Company's policy were applicable to the conduct of the Anspach brothers.

"The trial court erred in imputing knowledge to the Anspach brothers and in finding that the Anspach brothers knew that there were people in the house at the time of the incident."

Essentially, these assignments of error fault the trial court for declaring that Michigan Millers, as a matter of law, has no obligation to defend or to indemnify Anspach for what the trial court found to be intentional conduct on the part of Scott and Chris Anspach. Because we agree with Anspach and Simpson, we reverse the judgment of the trial court and enter judgment for Anspach and Simpson, as a matter of law.

The question presented in these assignments of error is limited to the applicability of insurance coverage. Thus, our analysis will rely on principles of insurance law rather than principles of criminal law. Before beginning our analysis, we note that Michigan Millers stipulated that Anspach's homeowner's policy was in effect on the date of the incident and provided, among other coverages, liability coverage for Anspach and his sons, Scott and Chris.

■ Michigan Millers first contends that Anspach and Simpson did not meet their burden to show that coverage was triggered under the policy because there was no "occurrence" as defined by the policy, since the actions of all the juveniles were intentional. Michigan Millers' policy states that *"occurrence"* means an "accident * * * which results, during the policy period, in: *a. bodily injury* * * *."* (Emphasis *sic.*)

In *Physicians Ins. Co. v. Swanson* (1991), 58 Ohio St.3d 189, 193, 569 N.E.2d 906, 910–911, the Ohio Supreme Court adopted the reasoning in *Quincy Mut. Fire Ins. Co. v. Abernathy* (1984), 393 Mass. 81, 84, 469 N.E.2d 797, 799, in which the Supreme Judicial Court of Massachusetts stated that "the resulting injury from a volitional act of an insured is still an 'accident' within the meaning of an insurance policy if the insured does not specifically intend to cause the resulting harm or is not substantially certain that such harm will occur." Thus, the *Swanson* court has construed "accident" within the context of an insurance policy to include unintended injuries resulting from intentional acts.[2] From the point of

---

2. We recognize that the *Swanson* court arrived at this definition of "accident" in its analysis of the application of a policy exclusion in which the burden of proof is on the insurer to demonstrate that the insured intended to cause the resulting injury, rather than as in our analysis of the triggering of coverage in which the burden of proof is on the insured to show that the resulting bodily injury was caused by an occurrence. In our view, the distinction is not material.

view of the insureds, because there is no evidence in the record to show that Scott and Chris had an intention to injure Judith or Amanda by undertaking their intentional actions as lookouts during the burglary, the occurrence was an accident as a matter of law. Thus, we conclude that Anspach has met his burden to trigger coverage.

Both Anspach and Simpson contend that the exclusion for expected or intended bodily injury and the exclusion for intentional or criminal acts do not apply to the actions of the insureds, Scott and Chris. We agree for the reason that Michigan Millers has not met its burden of proof under either exclusion by coming forward with evidence to show that the actual injuries suffered by Judith or that the death of Amanda (1) was expected or intended by Scott or Chris, or (2) was reasonably expected as a result of their intentional or criminal acts. We note, again, that our analysis is confined to insurance law principles, since the question before us is one of insurance applicability.

 With respect to the exclusion for bodily injury that is expected or intended, Michigan Millers's policy contains the following language for its liability coverage: *"Personal Liability Coverage * * *—Medical Payments to Others* do not apply to *bodily injury* or *property damage:* a. which is expected or intended by the *insured.*" (Emphasis *sic.*) We note that although the trial court cited *Preferred Risk Ins. Co. v. Gill* (1987), 30 Ohio St.3d 108, 30 OBR 424, 507 N.E.2d 1118, and *Swanson,* in which the Supreme Court reaffirmed and clarified the holding in *Gill,* the trial court disregarded the underlying facts and reasoning in *Gill.* While the trial court acknowledged that the *Swanson* court focused its analysis on whether the insured intended to cause the resulting injury, it concluded that "[t]his analysis, at best, begs the question and avoids confronting the reality that it is *not* how someone [the insured] feels *after* an act that is relevant. The act itself creates the intent as a matter of law in certain circumstances. * * * In the case *sub judice,* the court must consider the nature of all the crimes involved in its analysis of whether the Defendants intended the results of certain acts." (Emphasis *sic.*)

The trial court then departed from applying insurance law principles to the facts before it and applied criminal law principles to find that Clark's and Spicer's knowledge, gained upon their re-entry into the house, could be imputed to Scott and Chris because they had participated in a conspiracy. The trial court also inferred Clark's specific intent to harm the Simpsons to Scott and Chris. The trial court concluded that *Swanson* "fails to set any standard by which its test may be applied in cases where criminal conduct is directly involved. Further, the Court finds where the criminal conduct is *malum in se,* such as Arson, the *Swanson* doctrine was never intended to apply."

In its defense of the trial court's decision, at oral argument, counsel for Michigan Millers argued that this is a case of first impression given the nature of the criminal conduct involved in the underlying action. We disagree and conclude that, as a matter of law, *Swanson* and *Gill* dictate the result in this case. It is fundamental that "[a]ll trial courts and intermediate courts of appeal are charged with accepting and enforcing the law as promulgated by the Supreme Court not changing, modifying or ignoring that law." *Consol. Rail Corp. v. Forest Cartage Co.* (1990), 68 Ohio App.3d 333, 341, 588 N.E.2d 263, 268.

The underlying facts in *Gill* indicate that the defendant murdered an eleven-year-old girl, hid her body in his garage, and joined in organized searches for her before her body was found the next day. Gill later pled guilty to aggravated murder. *Gill*, 30 Ohio St.3d 108, 30 OBR 424, 507 N.E.2d 1118. The parents of the victim filed a wrongful death action, including a claim for negligent infliction of emotional distress, against Gill. Gill's liability carrier filed a declaratory judgment action against him, requesting a declaration regarding its duty to defend and obligation to indemnify Gill for any judgment against him. *Id.*, 30 Ohio St.3d at 109, 30 OBR at 424–425, 507 N.E.2d at 1119–1120. Gill's liability policy included language providing that coverage for personal liability "does not extend to bodily injury or property damage 'which is expected or intended by the insured * * *.' " *Id.*, 30 Ohio St.3d at 113, 30 OBR at 428, 507 N.E.2d at 1123. The Supreme Court held that the victim's "death was clearly 'expected or intended by the insured' and therefore the policy does not provide coverage for whatever personal liability Gill may have." *Id.*, 30 Ohio St.3d at 115, 30 OBR at 430, 507 N.E.2d at 1124.

Our reading of *Gill* indicates that the Supreme Court looked at the language of the policy that excluded from coverage bodily injury that was expected or intended by the *insured* with respect to a *malum in se* crime: aggravated murder. As counsel for Simpson emphasized during oral argument, had the Supreme Court wanted to distinguish *malum in se* crimes from intentional or negligent tortious conduct, it would have done so in *Swanson*, a case in which a child fired a BB gun at two other children, injuring one child in the leg and blinding a second child. Instead of distinguishing tortious from criminal conduct, the Supreme Court re-examined, followed, and clarified its reasoning in *Gill* stating:

"Thus, our holding that there was no coverage in *Gill* was premised on the facts that the insured intended to cause the injury of another person, and that this intent was conclusively established by the insured's plea of guilty to aggravated murder. Stated otherwise, our decision was based on a finding that the insured intended to cause an injury, *i.e.*, the death of an eleven-year-old girl. While *Gill* used language regarding the intentional act or conduct of the insured,

*Gill* actually stands for the proposition that it is the resultant injury which must be intended for the exclusion to apply to deny coverage." *Swanson,* 58 Ohio St.3d at 191, 569 N.E.2d at 909.

As the court held in *Swanson,* "[i]n order to avoid coverage on the basis of an exclusion for expected or intentional injuries, *the insurer must demonstrate that the injury itself was expected or intended.*" (Emphasis added.) *Swanson* at syllabus; see, also, *Moler v. Beach* (1994), 102 Ohio App.3d 332, 335, 657 N.E.2d 303, 304–305 (following *Swanson* ). After examining case law from other states, the *Swanson* court explained:

"[I]n order for an exclusion of this nature to apply, an insurer must demonstrate not only that the insured intended the act, but also that he intended to cause harm or injury. The rationale for this rule of law is twofold. First, the plain language of the policy is in terms of an intentional or expected injury, not an intentional or expected act. Were we to allow the argument that only an intentional act is required, we would in effect be rewriting the policy. Second, as the courts above have noted, many injuries result from intentional acts, although the injuries themselves are wholly unintentional. * * * It is not sufficient to show merely that the act was intentional. In this case the exclusion is inapplicable because the trial court's determination that [the victim's] injury was not intentionally inflicted or substantially certain to occur is supported by competent, credible evidence. Therefore, the insurers are obligated to defend and indemnify the appellants." 58 Ohio St.3d at 193–194, 569 N.E.2d at 910–911.

It is telling that Justice Wright, in his dissent in *Swanson,* foresaw our result in the case before us by constructing the following scenario:

"Imagine, if you will, an arsonist who 'unintentionally' kills a tenant in an apartment building that the arsonist intentionally sets on fire. Thereafter, the estate of the victim brings a wrongful death suit against the arsonist tortfeasor seeking to recover for the tenant's death. Under today's holding, the insurance company, whose policy provides coverage for personal injuries caused by the arsonist, would be responsible for paying the wrongful death claim. For the insurance company to avoid paying the claim, it would have to show that the arsonist specifically intended to kill the victim when he burned the building." *Swanson,* 58 Ohio St.3d at 199, 569 N.E.2d at 915. (Wright, J., dissenting.)

Although Justice Wright was critical of this result, he clearly understood that it was required by the decision from which he was dissenting.

As in Justice Wright's scenario, although the arson was intended by all of the juveniles in order to conceal the burglary, the record contains sufficient evidence to indicate that none of the juveniles expected the house to be occupied when they instigated the burglary plan, nor did any know the house to be occupied

when Clark and Spicer broke into the house, nor did any of the juveniles acting as lookouts know that the house was occupied until after Clark had started the fire, had fled the house, and Spicer again asked Clark about the people in the house as the group was fleeing the scene.

■ With respect to the intentions of Scott and Chris, Michigan Millers has failed to point to any evidence in the record that the Anspach brothers intended or expected the resulting injuries suffered by Simpson and the death of Amanda. The evidence in the record is limited to showing that the Anspach brothers intended harm to property, by committing burglary and arson. Moreover, when asked during oral argument, counsel for Michigan Millers failed to point to any case law in Ohio or elsewhere supporting its argument that the intent of Clark to harm the Simpsons can be transferred to the Anspachs in a case involving a question of insurance coverage. As we stated in *Moler*, when considering the applicability of insurance coverage, we decline the invitation "to extend the application of the inferred intent rule beyond the scope * * * of gunshots at point blank range and the sexual molestation of children." *Moler*, 102 Ohio App.3d at 337, 657 N.E.2d at 306. Based on the policy language in the expected or intended bodily injury exclusion, the applicability of insurance coverage is determined by the intent of the insured to cause the resulting injury itself.

■ With respect to the intentional acts exclusion, we conclude that Michigan Millers has not met its burden of proof to show that bodily injury or death would have been reasonably expected given the actual conduct of the Anspach brothers or to show that they actually intended the resulting injuries. The language in the intentional acts exclusion reads: "We do not cover any bodily injury or property damage which may reasonably be expected from the criminal acts of the insured or which is intended by the insured person."

In order for this exclusion to apply, Michigan Millers must show that bodily injury may reasonably have been expected from the actual conduct of the Anspach brothers. This analysis examines the actual conduct of the insured person rather than the criminal convictions of the insured. *Gill*, 30 Ohio St.3d at 113, 30 OBR at 428, 507 N.E.2d at 1123, fn. 5. While the record contains evidence that Scott and Chris knew of the plan to set the house on fire, the record contains no evidence that Scott and Chris knew that the house was occupied when Clark and Spicer broke into the house or re-entered the house with the gasoline can. The evidence indicates that their actions were confined to acting as lookouts outside the house. Michigan Millers has failed to show that Simpson's bodily injuries and Amanda's death may have been "reasonably expected" given the actual intentional or criminal conduct of Scott and Chris as lookouts.

■ In determining insurance applicability as this exclusion is written, we cannot transfer the intent of the insured person to injure property to the intent to cause bodily injury. Moreover, as in the analysis of the previous exclusion, it is improper, as a matter of law, to impute Clark's knowledge that the house was occupied, and to impute Clark's criminal intent in setting fire to an occupied house, to the Anspach brothers. By examining the conduct of the Anspach brothers and their actual intentions, this policy exclusion precluding coverage for intentional acts is not applicable. Thus, we do not reach the question whether public policy prohibits liability insurance for intentional torts. But, see, *Miller v. Midwestern Indemn. Co.* (Feb. 23, 1996), Montgomery App. No. 15360, unreported, 1996 WL 397450, certified conflict accepted in (1996), 75 Ohio St.3d 1476, 663 N.E.2d 1303.

In response to Michigan Millers's argument that the criminal acts of the Anspach brothers are inseparable from the injuries and death based on language from *Gunter v. Meacham* (Sept. 20, 1995), Summit App. No. 17125, unreported, 1995 WL 553190, we note critical differences between the underlying act in *Gunter* and the case before us. First of all, the only persons involved in the underlying incident were Gunter, who lost an eye in a fight outside a bar with Meacham. Gunter conceded that his injury was the result of Meacham's assault on him. Meacham pled guilty to aggravated assault with a physical harm specification.

After Gunter filed a personal injury suit, Meacham's insurer filed a declaratory judgment action in which the trial court declared that coverage was precluded based on the policy's criminal act exclusion. Gunter appealed, contending that the exclusion was unenforceable. The court of appeals affirmed the judgment of the trial court given the specific facts before it, reasoning that "one who knowingly commits aggravated assault does so with a reasonable expectation that he will injure someone. * * * The crime and the injury are inseparable." *Id.*

Had Clark been the insured of Michigan Millers, we would agree with it that the crime and the injury are inseparable. Instead, the Anspach brothers are the insureds and their actual criminal act in the underlying incident was confined to acting as lookouts outside the house. The language in Michigan Millers's intentional-acts exclusion precludes coverage when an insured's conduct results in bodily injury that may have been reasonably expected from the insured's actual conduct or that was intended by the insured. The record contains no evidence that the Anspach brothers expected or intended the resulting injuries and death or that, based on their actual conduct, the resulting injuries and death would have been reasonably expected.

Anspach's and Simpson's first and second assignments of error are sustained.

## III

Simpson's third assignment of error is as follows:

"The trial court erred as a matter of law in finding that coverage for parental liability created by statute was excluded due to intentional acts of the children."

In view of our disposition of the preceding assignments of error, we find it unnecessary to consider Simpson's third assignment of error. Since we have concluded that Anspach and Simpson are entitled to judgment as a matter of law, we need not consider Simpson's contention that the trial court erred in finding that R.C. 2307.70 is confined to intentional acts as a prerequisite to holding the parents liable for the conduct of their minor unmarried children.

## IV

Anspach's and Simpson's first and second assignments of error having been sustained, the judgment of the trial court is *reversed*. Because we conclude that Anspach and Simpson are entitled to judgment as a matter of law, we enter judgment in their favor pursuant to App.R. 12(B).

FREDERICK N. YOUNG, and GRADY, JJ., concur.